# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| MGE UPS SYSTEMS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | NO. 3:04-0231 |
| | ) | JUDGE HAYNES |
| TITAN SPECIALIZED SERVICES, | ) | |
| INC., DAVID WHITE, | ) | |
| JT PACKARD AND ASSOCIATES, | ) | |
| INC., ROBERT BERGMAN | ) | |
| STAY'N POWER, INC., | ) | |
| RICK FREEMAN and JEFF CASON, | ) | |
| | ) | |
| Defendants. | ) | |

## M E M O R A N D U M

Plaintiff, MGE UPS Systems, Inc. ("MGE") filed this action under 17 U.S.C. § 501 et seq.,

of the copyright laws against the Defendants Titan Specialized Services, Inc., and David White.

Plaintiff asserts claims for copyright infringement for the Defendants' unauthorized use of its

registered software programs. Plaintiff also asserts state law claims for misappropriation of trade

secrets under the Tennessee Uniform Trade Secrets Act, Tenn. Code. Ann. § 47-25-1701 et seq., as

well as common law claims for conversion, unfair competition and business disparagement. Plaintiff

manufactures uninterruptible power supplies ("UPS") equipment that provides uninterruptible power

to its customers to protect them from power fluctuation or complete loss of power. Plaintiff

developed its copyrighted software to service and maintain its UPS equipment. Plaintiff's claims

arise from the Defendants' servicing of MGE's UPS equipment with Plaintiff's software programs

without Plaintiff's authorization.

During initial discovery, the Defendant White disclosed that he sold MGE's Pacret and

Muguet software programs as well as MGE's Data Disk and its collection of MGE trade secrets to

a number of individuals and business organizations that White described as "an underground network of field service engineers" in the UPS industry. The members of this network shared MGE's software and other technical information on servicing of MGE's UPS equipment. The network's members included Defendants: JT Packard and Associates, Inc. ("JTP"), Jeff Cason, JTP's chief executive officer, Robert Bergman, Stay'n Power, Inc., and Rick Freeman.

By amended complaints (Docket Entry Nos. 20 and 555), MGE named these persons and entities and other defendants several of whom have since settled and have been dismissed (Docket Entry Nos. 302, 395, 397 and 400) except for the remaining Defendants. MGE also added claims for violations of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201, et seq., and violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq.

On June 14, 2004, MGE filed an emergency motion for preliminary injunction (Docket Entry No. 38) to enjoin JTP's continued infringement of its Pacret and Muguet software and to enjoin JTP'S continued use of its trade secrets from MGE's data disk. MGE also sought an order for impoundment of the infringing material. An evidentiary hearing was held and thereafter on July 16, 2004, Judge Robert L. Echols, district judge, entered an Order granting MGE's motion and awarding a preliminary injunction and the impoundment remedy. In sum, this Order enjoined the defendant JTP from: (1) using MGE's software and data disk for any purpose; (2) using any MGE software program and/or data disk to establish a communications link to any MGE UPS equipment for the purpose of servicing or repairing any MGE UPS equipment; and (3) altering, destroying, disseminating, copying or duplicating in any manner any software or data disk used to communicate with any MGE UPS system. (Docket Entry No. 133). The exact and pertinent language on the

2

injective relief in the Order is as follows:

> 10. Plaintiff's Emergency Application for Preliminary injunction and Request for Impoundment of Infringing Articles (Docket Entry No. 38) is hereby GRANTED AS MODIFIED. Accordingly, Defendants, their agents, servants, employees, and those persons in active concert or participation with Defendants are hereby ORDERED to refrain from:
>
> > (a) using MGE's software and data disk for any purpose;
> > (b) using any software program and/or data disk to establish a communications link to an MGE-manufactured UPS system for the purpose of servicing or repairing an MGE-manufactured UPS device; and
> > (c) altering, destroying, disseminating, copying, or duplicating in any manner any software or data disk used to communicate with an MGE-manufactured UPS system.

Id. at pp. 2-3.

In addition, the Court ordered the impoundment of "[a]ll infringing software, as well as any misappropriated data disk used to service or establish a communications link to an MGE-manufactured USP system." Id. at p. 3. The Court required MGE to deposit a $100,000 bond to cover any damages to the Defendants from the impoundment. Id. In its Memorandum, the Court cited the bond as necessary to cover any damages due to the impoundment if it were later determined that the Defendants had been "wrongfully restrained". Id. MGE posted its bond on July 20, 2004 at 4:35 p.m. (Docket Entry No. 144).

On May 22, 2006, MGE filed its emergency motion for a show cause hearing (Docket Entry No. 484). MGE's motion cited its proof that JTP violated this Court's Preliminary Injunction and Impoundment Order by: (1) JPT's continued use of MGE's software; (2) JTPS's continued use of MGE's trade secrets on MGE's data disk; and (3) JTP's failure to provide for impoundment all copies of MGE's software and data disk. (Docket Entry Nos. 484, 485 and 486). For these

violations, MGE sought a finding of contempt and other sanctions, including the striking of JTP's pleadings.

On May 23, 2006, this Court granted MGE's emergency motion for show cause and set an evidentiary hearing that was held on June 5 and 6, 2006. After that hearing, the parties submitted proposed findings of fact and conclusions of law as well as other supplementary evidence and memoranda (Docket Entry Nos. 540, 551, 553, 573, 575, 578, 579, 580, 585, 586, 587, 589, 591, 597, 601, 603, 604, 608, 609, 610, 611, 615, 617 and 631).

As a preliminary matter, the Court notes MGE's request to exclude JTP's submissions of depositions of persons other than those employees for whom JTP sought to admit their declarations at the June, 2006 evidentiary hearing. At that hearing, JTP offered these declarations for proof and based upon cited authorities, the Court ruled that cross examination was necessary for those declarants whose declarations were contested. (Volume III, Transcript of June 6, 2006 hearing at pp. 230-32). The Court left the hearing record open to allow depositions of those declarants after the hearing. Id. To be sure, JTP's counsel cites his statement that the record would be left open for other depositions. JTP correctly states that MGE's counsel were present at the challenged depositions submitted in its post hearing submissions. The Court's ruling at the June, 2006 hearing was to allow depositions of those declarants whose declarations JTP sought to introduce at the hearing. There are statements of counsel consistent with the submissions of other depositions with cross-designations by the parties' counsel. Given the potential confusion on this issue and in an abundance of caution, the Court denies MGE's request to strike.

For the reasons stated below, the Court finds that Defendants JTP and Cason have violated the terms of the July 16th Order by the Defendants' continued retention and use of MGE's software

4

and "Data Disk" that are covered by that Order.  Set forth below are the Court's findings of fact and

conclusions of law on MGE's motion for contempt and sanctions.

## A.  FINDINGS OF FACT

### 1.  The UPS Market

MGE manufactures systems for uninterruptible power supplies ("UPS") to ensure its

customers a constant supply of power for their operations, in the event of a power shortage or outage,

e.g., a lightning strike.  To service its UPS systems, MGE developed its two copyrighted software

programs, Pacret and Muguet, to assist its field service engineers in the maintenance of its UPS

equipment.[1]  The Muguet software is the trouble shooter software for MGE's "Comet (Ingrid)" UPS

equipment. The Pacret serves the same function for MGE'S "Galaxy" line of equipment.  This

software also protects the hardware and the data on the customer's system.  These software programs

reduce the time necessary to service MGE UPS equipment.   Any person with the software can

obtain access to MGE equipment and could shut down a customer's system or set the power volume

to cause equipment failure.

To operate MGE's software requires a "dongle," a device that serves as a padlock and

attaches to the back of the field engineer's laptop computer and the UPS system.  The "dongle"

establishes communications between the computer and MGE's UPS circuitry board and allows the

MGE software and MGE UPS equipment to communicate so as to test the essential elements of

MGE's UPS's operational functions.   The dongle has a unique password for each key and is

programmed to expire at a specific time or after a specific number of uses.  The dongle  prevents

---

[1]MGE's copyright registrations numbers with the United States Copyright Office are:
TXu1-142-309, TXu1-142-310, TXu1-108-674, TXu1-108-675, TXu1-108-676, and TXu1-108-
677).

5

unlicensed use and copying of the MGE's software so that MGE's software will not fully launch without the dongle plugged into a communications port and the laptop computer.

MGE also developed a number of trade secrets for the maintenance of its UPS equipment and that library of technical information is stored in electronic form on a CD-ROM that MGE describes as its "Data Disk." See e.g., Plaintiff Exhibit No. 2. MGE's Research and Development department developed its trade secrets and software information that are contained on MGE's Data Disk. MGE's Data Disk also contains detailed schematics, drawings, technical information and procedures for MGE's factory-trained field service engineers to use the Pacret and Muguet software. The technical information on the Data Disk provides for the highest level and most efficient service for MGE's UPS equipment.

The manual on MGE's Data Disk is clearly labeled as "PROPRIETARY INFORMATION" and "THE INFORMATION IN THIS DOCUMENT IS PROPRIETARY IN NATURE AND IS NOT BE RELEASED TO PERSONNEL OUTSIDE OF MGE UPS SYSTEMS." Plaintiff's Exhibit 2. The manual is a "Users Guide" for MGE's Comet Software. Id. MGE employees must sign confidentiality agreements for usage of the MGE software and Data Disk. MGE collects its confidential information, including the software, Data Disk and other tools where an employee leaves its employment or breaches MGE's confidentiality agreement.

JTP manufactures rebuilt UPS equipment from systems that JTP purchases on the market. JTP also services UPS equipment manufactured by other firms, including MGE. A JTP affiliate, Northern American Power is a MGE distributor, but MGE supplies the maintenance services for equipment sold by Northern American Power. Maintenance of MGE UPS equipment produces approximately one-third of all of JTP's revenue.

6

## 2. JTP's Acquisition of MGE Software and Data Disk

In 2003, Jeff Cason, JTP's chief executive officer, instructed Peter Drumm, JTP's general manager to obtain a copy of MGE's software programs to allow JTP to provide complete service for its clients with MGE UPS equipment. Drumm characterized Cason's instruction as a "directive" and Cason considered the acquisition of MGE's software a "mission" of the company. (Volume III, Transcript of June 6, 2006 hearing at pp. 240-241).

Drumm solicited several former MGE employees, including Salvador Puga, a then former MGE employee, who at the time was employed at Power Maintenance International, Inc. ("PMI"). In a series of e-mail exchanges, Plaintiff's Exhibit Nos. 10-11, Drumm offered Puga employment at JTP. In one of the e-mails, Drumm instructed Puga to provide MGE's software "asap." Plaintiff's Exhibit No. 11. After confirming that Puga could and would provide this software, Drumm sent an e-mail to Chris Barton, JTP's manager at that time, and Nicholas Cindric, a JTP sales manager that "MGE's software "on the way."[2] Plaintiff's Exhibit 10. Later, Puga accepted JTP's employment offer and at Drumm's instruction, Puga installed a copy of MGE's Muguet software onto a JTP laptop. Neither Puga nor JTP had a dongle, and Puga's copy of the MGE's software failed to launch. Puga made a backup copy for his JTP-issued laptop, which included the Muguet software. Puga did so to avoid losing this data on his JTP laptop.

Professor Willis Marti, MGE's software expert, analyzed the backup copy of MGE's software on Puga's laptop and found three versions of MGE Muguet software and one copy of MGE's Pacret software. One version MGE's Muguet software was "cracked" and two were "uncracked." (Docket Entry No. 579 at Tab E at pp. 24, 25, 26). MGE's Pacret software found on

---

[2]Tran. Vol. 2, p. 149-151 and Plaintiff.

7

Puga's JTP computer backup was "cracked." JTP did not attempt to retrieve and impound MGE's

software from Puga's JTP computer at any time after receiving this Court's July 16, 2004 Injunction

and Impoundment Order. As noted further below, JTP also did not disclose that JTP had obtained

MGE's software from Puga during discovery.[3]

By the summer of 2003, Scott A. Sorgenfrei, JTP's then director of technology possessed

and tested MGE's Muguet and Pacret software that was obtained from Puga. This software was not

on a disk, but had been loaded onto a JTP laptop computer. This JTP computer had three versions

of the Muguet software and one or two versions of the Pacret software. Cason directed Sorgenfrei,

along with JTP's employees Steve Evans and Tighe Robey, to "reverse engineer" MGE's software

so as to eliminate the need for the dongle.

Sorgenfrei, with Steve Evans, a former MGE employee and then JTP service manager as well

---

[3]MGE notes that JTP's answer to MGE's Interrogatory No. 12 about sources of MGE
that did not disclose Puga as a source of MGE's software.

> Interrogatory Number 12. Please identify all the persons from who You have gained
> physical possession of any MGE Programs, any computers onto which any of the
> MGE Programs had been or have been loaded, the Data Disk or any contents or
> portion thereof, and/or any MGE Dongle, and describe with particularity the
> circumstances by which You gained possession (including, without limitation, the
> date You gained possession, the geographic location at which You gained possession,
> and the price, if nay, You paid for acquiring possession).

> Answer:
> JT Packard obtained MGE programs in mid-2003 when it purchased a CD-ROM
> from David White for $18,000 of in-house JT Packard credit. The circumstances
> under which JT Packard obtained the CD-ROM from David White are set forth in the
> July 1, 2004 declarations of Jeff Cason and Tighe Robey which have been filed in
> this case.

(Plaintiff's Exhibit 13).

8

as Tighe Robey, JTP's service manager tried to "crack" the MGE's software acquired from Puga. The "cracked" process attempts to identify a code or word value that is transmitted through the communications board to open the software. If the "cracked" process is successful, MGE's software is altered to circumvent "the dongle" so as to enable a JTP technician to access MGE's software and test MGE's UPS equipment. JTP officials' efforts to provide a "cracked" version of MGE's software from Puga were unsuccessful.

Sorgenfrei next obtained from Joseph Stamper, a former MGE employer, MGE's Data Disk that contains MGE manuals, field service bulletins, drawings and other information about MGE UPS equipment. Stamper obtained this Data Disk from DC Group, his former employer,[4] and mailed it to Peter Drumm, JTP's general manager. Stamper later joined JTP. During Sorgenfrei's tenure, JTP had thousands of pages of MGE's technical material on MGE's UPS equipment. JTP placed the technical information from MGE's Data Disk onto the JT Packard network "I drive" that was available to all JTP field service engineers before and after the Court's July 16, 2004 Injunction and Impoundment Order and until March 24, 2006. Defendants Exhibit 14. With the substitution of logos, the substance of MGE's "Comet (Ingrid) Softunor User's Guide" (Plaintiff Exhibit No. 2) is virtually identical to JTP's 'Comet (Ingrid) Softunor User's Guide." Plaintiff's Exhibit 3.

MGE contends that Stamper may also provided JTP with MGE software, citing Sorgenfrei's testimony about his work on three different versions of the Muguet software that included one from Stamper. Drumm admits that he never looked at the Stamper CD-ROM to determine if that disk included any MGE software. In any event, Rod Saunders, MGE's executive liaison and consultant for this litigation analyzed the Stamper Data Disk and identified 92 MGE trade secrets on that disk.

---

[4]DC Group is a defendant in another civil action filed by MGE.

9

The Stamper Data Disk remains in JTP's possession and has not been produced for impoundment.

Later, JTP purchased a "cracked" version of MGE's software from David White. Cason described JTP's purchase of MGE's software from White in an e-mail addressed to JTP personnel as follows: "Echo, Bravo, Whiskey, Niner. The Eagle has landed. Repeat: The Eagle has landed. Rendezvous to the next e-mail for the flight pattern." Plaintiff's Exhibit 12. JTP was successful with White's "cracked" version of MGE's software and used this software to service MGE USP equipment of its customers.

In its earlier ruling on Plaintiff's emergency motion for a preliminary injunction and impoundment, the Court found as follows:

> Plaintiff introduced registration certificates from the United States Copyright Office reflecting MGE's ownership of certain software products titled "Pacret Soft Tunor Galaxy 3000 Soft Tunor Galaxy EPS 6000" and "Muguet Softunor Tunor Galaxy EPS 3000." According to Plaintiff's testimony, these copyrights cover the proprietary software developed by MGE to more efficiently and quickly service the MGE UPS equipment sold to its customers. Typically, MGE UPS units are sold with a one-year warranty. The customer must use MGE maintenance to keep the warranty in force. After the first year, the customer may contract with MGE for continued maintenance of the MGE UPS equipment or contract with others to perform the maintenance service.
>
> Defendant David White, a former employee of MGE, admits in his deposition that he improperly retained a copy of the MGE maintenance software and data disk when he left the company. It is also undisputed that White sold the software and data disk to Defendant JTP for $18,000. Although JTP alleges that White stated he developed his own software to use in servicing the MGE equipment and it did not know the software belonged to MGE, JTP admits is distributed the software to its field engineers to use in performing service work on the MGE UPS equipment under maintenance contracts with its customers. JTP also admits it had tried to purchase the MGE UPS software from others, but they would not sell it to JTP. JTP did not attempt to buy the software from MGE or obtain a Licensing Agreement to use the software. Therefore, MGE's proprietary software is being used by JTP and others, including some of the Defendants, in performing maintenance and service on the MGE UPS equipment.

10

* * *

> At the hearing, JTP's representative testified that roughly one-third of its revenues derive from servicing UPS machines. And JTP's representative, along with Defendant Bergman, testified that it is difficult if not impossible to service the machines without the disputed software.

* * *

(Docket Entry No. 132, Memorandum at pp. 8-9, 10).

Sorgenfrei explained that the MGE software "is not required to perform the majority of the maintenance on the MGE UPS" (Volume I, Transcript of June 5, 2006 hearing at p. 19), but with this information, JTP could provide complete service. Once JTP accessed a version of the MGE software, Sorgenfrei explained that JTP "promoted the fact that we had the software and could perform all maintenance and all services on the UPS." Id. at 20. In addition with this information JTP could manufacture UPS equipment with MGE features at less cost than could MGE. Steven Evans, a former MGE employee whom JTP hired also testified that with MGE's Data Disk from Stamper and White's "cracked" version of MGE's software, JTP could install MGE's system into JTP's rebuilt UPS equipment and sell that equipment at less cost.

Sorgenfrei was uncomfortable about his possession and JTP's acquisition of MGE's software and data disk without MGE's permission. Sorgenfrei knew that MEG had restrictions on access to its information. Sorgenfrei was aware that the drawings on the Stamper Data Disk had MGE's legend that MGE claimed proprietary rights in this information and MGE required its written permission to disclose this information to third parties. Sorgenfrei knew that JTP did not have a license to use the MGE's software. Id. at p. 26. When Sorgenfrei expressed his discomfort with JTP's use of MGE's software without MGE's authority, Cason responded "it did not matter because

11

there was so much money to be made by having the software." Id. at p. 25.

Professor Willis Marti, MGE's computer expert, found that the MGE software that JTP purchased from White, was virtually identical to MGE's Pacret and Muguet software. The only modifications were that certain lines of code dedicated to the dongle had been circumvented to eliminate the need for MGE's dongle. Professor Marti identified other MGE technical information on JTP materials, including the White material that included MGE's Data Disk.

### 3. JTP's Post Injunction Conduct

After the July 16th injunction, Sorgenfrei discussed the MGE software with Cason and "Cason told me that we would continue to use the [MGE] software internally and keep a copy internally so we could configure units before they went out to the field . . . and to customers who purchased them."[5] (Volume I, Transcript of June 5, 2006 hearing at pp. 22-23). (emphasis added). Once the injunction was issued, JTP took the position that the software was unnecessary for maintenance of the MGE UPS equipment. Id. at 21. According to Drumm, JTP's view of the Order granting the injunction on data disk "was over the software or any technical information that he received from David White that was over understanding of what the data disk was." (Volume III of June 6, 2006 hearing Transcript at p. 256). Drumm's understanding "was to retrieve everything that we had received from David White and that's what we tried to do. That's what we did do.", id. at p. 373 and "I do not believe we got technical information from David White." Id. at p. 271. As the Defendants' counsel stated about materials covered by the July 16th Order, "All that mattered was that it didn't come from David White" (Vol. I, Transcript of June 5, 2006 hearing at p. 126).

---

[5]Cason did not appear at the hearing to contradict this testimony. Cason was on a fishing trip in Canada.

Drumm admitted that after July 20, 2004, many of the technical documents impounded from the David White materials were also in the Stamper materials and remained available on JTP's "I drive" after the July 20th Order granting the injunction. After the injunction, Robey and other JTP employees continued to access and utilize MGE's Data Disk that Stamper provided, until March 24, 2006. Defendant Exhibit No. 14.

In response to the Court's injunction and impoundment order, Drumm, JTP's general manager sent the following e-mail to JTP employees:

> On July 6th of this month, I sent all of you an e-mail informing you of the current litigation involving a number of Independent UPS Service Organizations (including JT Packard) around the country and MGE UPS Systems. In this e-mail, I instructed all of you to not distribute or delete any versions of the software that we use to service MGE equipment.
>
> By this memo, I am directing all JT Packard employees to immediately cease using this or any other software to service any MGE UPS System, and to not copy, use, destroy, modify or distribute any copies of the software. All disks containing copies of the software should be sent immediately to me. As an organization, we will make other arrangements if any of our customers need a level of service that would require software used to service MGE equipment. Contact your regional manager if you find yourself in a situation that communication with UPS is required.
>
> To reiterate, until further notice, no JT Packard employee should be using, copying, notifying, distributing or destroying software used to service MGE UPS equipment. Do not discuss this matter with anyone outside of the organization.
>
> If you have any questions, please contact your Regional Manager or myself.

(Defendant Exhibit No. 14).

JTP's e-mail to its field engineers reflects instructions that JTP field engineers were to provide only the disk with the MGE software. Defendant Exhibit No. 5. Drumm testified that the MGE's Muguet and Pacret software remain on JTP's computers. (Volume III, Transcript of June 6, 2006 hearing at p. 394). JTP only disabled the icon on its laptop computers. Id. This icon was

13

used to identify where to access MGE's software on JTP computers. Id. Tighe Robey, JTP's service manager with responsibility for computers, was also involved in compliance with the injunction order. Robey did not inquire of JTP'S field engineers if any had a backup version of the MGE software on their laptop computer. According to Robey, the hard drives for JTP's computers were not replaced until the first half of 2005.

MGE insists that its proof establishes that JTP continued to use its software a few days after the Court's July 16th Order. MGE cites a JTP field report dated July 20, 2004 reflecting that at "1900" pacific time, i.e., 9:00 p.m. central standard time, after MGE posted its bond, Puga used MGE's software to assist another JTP employee to connect to MGE UPS equipment at the Microsoft facilities in Mountain View, California. According to Puga, such an event occurred in July or August 2004. Puga testified that, Javier Meras, JTP employee, made a telephone call to him stating that his laptop was connected to MGE's UPS equipment and Meras needed technical assistance with the MGE software. Puga told the employee about the injunction. According to Puga, Meras commented that he would use the MGE software just that one time. Puga insists that he provided Meras with guidance on use of the MGE software. Meras denies Puga's version of these events and denies any use of MGE software at that location on that date. Yet, Meras conceded that he had his laptop connected to the MGE UPS trying to adjust a float, but denies the event occurred in August, 2004. (Docket Entry No. 585, Meras Deposition Excerpt at JTP Deposition 0288).

The parties analyze proof of Puga's prior erroneous statement in his deposition denying his use of MGE's software and the events that followed Puga's disclosure about that statement. The Court does not resolve the parties' dispute about the factual circumstances of Puga's cited deposition testimony and JTP's reaction thereto. The Court notes that Defendant's Exhibit 7 reflects a July 20,

14

2004 service visit by Puga and Javier Meras that includes an "ok" of the "Operational Verification" of the output, input and bypass voltage mechanisms on a MGE-UPS product at that facility. That proof, coupled with the testimony of Sorgenfrei, Evans and Robey, establish that the MGE software was necessary to verify this component of MGE's UPS equipment. These facts leads the Court to credit Puga's testimony about a post-injunction use of MGE software.

Other JTP employees confirmed that MGE software is necessary and was used to check "Operational Verification" settings for any MGE UPS equipment. JTP's filed reports contain a section entitled "Operational Verification" of: (1) the input over-voltage; (2) the input under-voltage; (3) the output over-voltage; and (4) the output under-voltage. See Plaintiff's Exhibits Nos. 4 and 5. Meras testified as follows:

> Q. Okay. So can you or can't you - - let me just ask you one more. On the operational verification form of the JT Packard field service report for the UPS performance checklist, the last page that says operational verification, in order to be able to check okay, do you have to use MGE software?
>
> A. Yes.

(Docket Entry No. 579, MGE's Deposition Designations at Tab B, p. 86).

Tom Stack, another JTP employee testified about the necessity of MGE's software to complete certain sections in JTP's field services reports.

> Q. Now, under operational verification, are there any categories there that you claim requires the software?
>
> A. Yes.

\* \* \*

15

Q.      Now, on an MGE device on a system 3000 unit, it's your testimony that none

of the parameters in operational verification on this Exhibit 100 can be

determined without the software?

* * *

THE WITNESS: All I can - maybe equipment over-temperature, and that would

be more of a - - visual, but there's no - - all of these other readings are – there's no -

-you have to use the - - software to use that, to check that.

* * *

Q.      How do you get those readings with a Comet or a Galaxy?

A.      You would have to - - you would have to have software.

(Docket Entry No. 579, MGE's Deposition Designations at Tab A at pp. 64, 68, 168).

To be sure, JTP submitted proof that after the injunction, JTP field engineers could perform

an "operational verification" on MGE UPS equipment without the MGE software. (Docket Entry

No. 584, JTP Deposition Designation of Jamie Griffin at 0132-136; Jason Kingery at 0231-32; and

Michael Rick at 0327, 332-33). Yet, Kingery conceded that software was necessary for alarm history

and checking battery alarms. Id. at 0234. Rick, however, disputes Kingery's testimony that MGE

software was necessary for testing of batteries. Id. at 0327-28. Griffin testified that JTP did not have

any policy or provide any training on checking the "operational verification" section of the field

service report without MGE software. Id. at 0130-31. Without the software to verify this type of

information, Merdas rated his level of maintenance performance only 80%, but Meras does not

report that rating to the customer. Id. at 0277.

In any event, MGE cites Tighe Robey, JTP's service manager who testified that MGE

16

software was necessary to verify output over-voltage even with an alternative method of verification.

Q. Okay. Thank you. Under "Operational Verification," do you see "Output Overvoltage"?

A. I do.

Q. Can that be determined without the software?

A. It can.

Q. How would you do it?

A. By letting the UPS go into alarm and seeing if it would alarm.

Q. How would you put it into alarm?

A. Well, correct - - I'd like to correct that statement.

Q. Okay.

A. You would have to use the software in order to get it to the overvoltage state.

Q. And so in order to determine that it's okay, it's your position you would need the software?

A. Yes.

Q. So if somebody has checked the "okay" boxes, that would be an indication that they did, in fact, use the software?

\* \* \*

THE WITNESS: It could be assumed but not guaranteed.

Q. Would you click "okay" if you had not guaranteed it?

\* \* \*

A. No, I would not.

17

Q.    Do you think a field service report should assume it's okay without verifying it?

* * *

THE WITNESS: Without verification, no.

(Docket Entry No. 486, Exhibit D thereto, Robey Deposition Excerpt at pp 192-93).

MGE and JTP stipulated that after the injunction, 162 of JTP's field service engineers' completed service reports reflect that JTP employees continued to check, access or otherwise verify: (1) the input over-voltage value; (2) the input under-voltage value; (3) the output over-voltage value; and (4) the output under voltage value on MGE UPS devices. These items on JTP's field service reports reflect the field service engineer's "operational verification" of those functions on MGE's UPS equipment that require the MGE software. The Court finds that these reports reflect JTP's usage of MGE''s software, after the injunction, at least for the "output overvoltage" verification. The Court notes the undisputed statement of Cason, JTP's chief executive officer after the July 16TH Order: "Cason told me that we would continue to use the [MGE] software internally and keep a copy internally so we could configure units before they went out to the field . . . and to customers who purchased them."[6] (Vol. I, Transcript of the June 5, 2006 hearing on June 5, 2006 at pp. 22-23). (emphasis added).

In sum, the Court finds, based upon the testimony of Robey, Drumm, Evans and Sorgenfrei that MGE software was necessary to perform the operation verification assessment on MGE UPS equipment. In addition, the Court finds that JTP used MGE's software after July 20, 2004, the effective date of the Court's Order granting the injunction against such usage.

---

[6]Cason did not appear at the hearing to contradict this testimony. Cason was on a fishing trip in Canada.

Case 3:04-cv-00231   Document 701   Filed 12/06/06   Page 18 of 28 PageID #: 9070

At the time of the June 6th hearing, Drumm stated that after the injunction MGE Data Disk had been sequestered, but remained with JTP. Drumm concedes that the JTP still has the "Comet ( Ingrid) Software User's Guide" (Plaintiff's Exhibit 3) that was not given to the U.S. Marshal enforcing the impoundment order. (Volume III, Transcript of June 6, 2006 hearing at p 246). Robey likewise concedes that Plaintiff's Exhibit 3 is in JTP's hard-drive and is labeled as MGE-EPE, id. at p. 287 and was available on the JTP network after the injunction until March 24, 2006. Plaintiff Exhibit 3 is labeled as a JTP document, but except for the deleted MGE logo and confidentiality designation and about four (4) pages of MGE materials, this document is otherwise an identical copy of the Muguet software user's guide. Plaintiff Exhibit 2. Rod Saunders, MGE's analyst of JTP's digital copy of MGE's technical data disk after the July 16, 2004 injunction, identified 92 documents on JTP's computers that were MGE's trade secrets originating from MGE's Data Disk. See Plaintiff's Exhibit No. 8.

Finally, Sorgenfrei testified that in 2005, e-mails, including e-mails to customers with equipment information, were deleted at the instruction of Cason's wife. (Volume I, Transcript of June 5, 2006 hearing at pp. 40-42). According to Sorgenfrei, some e-mails reported to be archived, were actually "deleted forever." Id. at p. 62. JTP's proof is that due to an overload of their database, a private company was hired to archive all e-mails that remain accessible. (Docket Entry No. 585, Cason Deposition at JTP0011-15). This issue cannot be resolved without a computer expert's analysis of JTP's computer.

According to Sorgenfrei, JPT reports were also altered to recommend replacement of a battery part or UPS's equipment, even though the original report did not reflect the customer's need for a replacement. Id. at p. 39. Sorgenfrei also testified that he never provided an attachment to his

19

declaration filed earlier in this action. Id. at pp. 64-65.

## B. CONCLUSIONS OF LAW

A threshold issue has arisen on the effective date of the Court's July 16, 2004 Order, i.e., is the Order effective when the Court signed the Order on July 16th or is the order effective July 20, 2004, when MGE filed the $100,000 bond set by the Court's Order. MGE argues that the bond was intended to cover only the costs of the impoundment order, not the injunction. JTP argues that under the law of this circuit, an injunction is ineffective until the bond for the injunction is posted with the district court (July 20th) and the $100,000 was also intended to cover JTP's damages, if JTP were "wrongfully restrained."

Fed. R. Civ. P. 65(c) provides that: "No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the Court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained..."

In the Sixth Circuit, a district judge can excuse the filing of a bond for an injunction in the exercise of its discretion. Moltan Co. v. Eagle Picher Industries, Inc., 55 F.3d 1171, 1176 (6th Cir. 1995)("the rule in our circuit has long been that the district court possesses discretion over whether to require the posting of security"). In Moltan, the appeal challenged a preliminary injunction order for its failure to require a bond. The Sixth Circuit held "We cannot overturn the prior published decision of another panel and are therefore bound by these previous decisions. Accordingly, we conclude that the District Court did not err in waiving the security requirement." 55 F.3d at 1176.

The Court agrees that the purpose of the $100,000 bond was to address any damages from the impoundment in the event the Defendant ultimately prevailed. Yet, the Court concludes that

20

Rule 65(c) controls in the absence of any language in the Order that the Court exercised its decision

not to require a bond for the injunctive relief portion of its Order. In these circumstances, the Court

is uncertain and relies upon Rule 65(c) to conclude that the bond was necessary for July 16th Order

to be effective. Thus, only JTP activity after July 20, 2004 at 5:00 p.m. Central Standard Time is

actionable on MGE's motion.

"[A]ll orders and judgments of courts must be complied with promptly" and failure to do so

can result in a finding of contempt. Maness v. Meyers, 419 U.S. 449, 458 (1975). The Supreme

Court expressly recognized that "courts have inherent power to enforce compliance with their lawful

orders through civil contempt." Shillitani v. United States, 384 U.S. 364, 370 (1966). Contempt

actions in a strict legal sense are sui generis and are neither civil actions nor prosecutions. Walashek

& Associates, Inc. v. Crow, 733 F.2d 51, 53 (7th Cir. 1984) (citing Myers v. United States, 264 U.S.

95 (1924)). "'[A]lthough civil contempt may serve incidentally to vindicate the court's authority,

its primary purposes are to compel obedience to a court order and compensate for injuries caused by

noncompliance.'" Redken Laboratories. Inc. V. Levin, 843 F.2d 226, 229 (6th Cir. 1988) (quoting

TWM Mfg. Co., Inc. v. Dura Corp., 722 F.2d 1261, 1273 (6th Cir. 1983)). "The contemnor is not

simply being punished for past behavior, but rather encouraged to shape its behavior to comply with

the order based on the undesirability of suffering the sanction." United States v. Tennessee, 925 F.

Supp. 1292, 1303 (W.D. Tenn. 1995).

The Sixth Circuit has held that the movant in a contempt proceeding must prove violations

of the Court's Order by clear and convincing evidence. Electrical Workers Pension Trust Fund of

Local Union # 58, IBEW v. Gary's Electric Service Co., 340 F.3d 373, 379 (6th Cir. 2003). Yet,

"[o]nce the movant establishes his prima facie case, the burden shifts to the contemnor who may

21

defend by coming forward with evidence showing that he is *presently* unable to comply with the court's order." Id. (emphasis in the original)  In this regard, the Court must consider what, if any, reasonable steps were taken to comply with the Court's Order.  Id.

For a finding of contempt, "'the facts found must constitute a plain violation of the decree so read.'" Cohn v. Kramer, 136 F.2d 293, 295-96 (6th Cir. 1943) (quoting Terminal R.R. Ass'n v. United States, 266 U.S. 17, 29 (1924).  The offending party must have " violate[d] a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." NLRB. v. Cincinnati Bronze, 829 F.2d 585 591 (6th Cir. 1987) (quoting SEC v. First Financial Group of Texas, Inc., 659 F.2d 660, 669 (5th Cir. 1981).  Violation of the Court's Order must be premised on the language of the Order: "'[U]nbroken lines of authority caution us to read court decrees to mean rather precisely what they say.' and ambiguities must be resolved in favor of persons charged with contempt." Grace v. Center for Auto Safety, 72 F.3d 1236, 1241 (6th Cir. 1996) (quoting NBA Properties, Inc. v. Gold, 895 F.2d 30, 32 (1st Cir. 1990) ( ellipsis in the original omitted).  An order in a contempt proceeding the order must be "read in light of the issues and the purpose for which the suit was brought." Cohn, 136 F.2d at 295-96.

As a matter of fact and law, this Court's July 16th Order extended not only to JTP, but also to its corporate officials.  The Order expressly applied to "the Defendants, their agents, servants, employees, and those persons in active concert or participation with [the] Defendants." (Docket Entry No. 133, Order at p. 2).  As a matter of law,

> A command to the corporation is in effect a command to those who are officially responsible for the conduct of its affairs.  If they, apprised of the writ directed to the corporation, prevent compliance or fail to take appropriate action within their power for the performance fo the corporate duty, they, no less than the corporation itself, are guilty of disobedience, and may be punished for contempt.

22

Gary's Electric, 340 F.3d at 380 (quoting Wilson v. United States, 221 U.S. 361 (1911)).

Based upon the above-stated factual findings, the Court concludes that JTP, Cason and its agents have violated the July 16th Order in several material respects. First, the Defendants and their counsel consider the July 16th Order to apply only to MGE materials received from David White. Drumm's understanding "was to retrieve everything that we had received from David White and that's what we tried to do. That's what we did do." (Volume III, Transcript of hearing on June 6, 2006 at p. 373). As the Defendants' counsel stated about materials covered by the July 16th Order. "All that mattered was that it didn't come from David White" (Vol. I, Transcript of June 5, 2006 hearing at p. 126). For this same reason, JTP argues that the "Data Disk" trade consists solely of two electronic "tif" (or "tiff") files that had allegedly been conveyed to the defendants by David White.

The controlling document here is the July 16th Order, in pertinent part, that reads as follows:

> Plaintiff's Emergency Application for Preliminary injunction and Request for Impoundment of Infringing Articles (Docket Entry No. 38) is hereby **GRANTED AS MODIFIED**. Accordingly, Defendants, their agents, servants, employees, and those persons in active concert or participation with Defendants are hereby **ORDERED** to refrain from:
>
> (a)   using MGE's software and data disk for any purpose;
> (b)   using any software program and/or data disk to establish a communications link to an MGE-manufactured UPS system for the purpose of servicing or repairing an MGE-manufactured UPS device; and
> (c)   altering, destroying, disseminating, copying, or duplicating in any manner any software or data disk used to communicate with an MGE-manufactured UPS system.

Id. at pp. 2-3. The Order also specified for impoundment "[a]ll infringing software, as well as any misappropriated data disk, used to service or establish a communications link to an

23

MGE-manufactured UPS system." Id. at p. 3.

First, the Court concludes that words "all" and "any" software or "any" data disk "used to service or 'establish a communications link" include all MGE software and data disks in JTP's possession or control regardless of the source. The MGE software and MGE Data Disk were to be surrendered and could not be used. The evidence clearly establishes that JTP obtained MGE's software from Sal Puga and MGE's Data Disk from Joseph Stamper. JTP failed to disclose the existence of the "uncracked" Muguet software provided by Sal Pug nor the MGE data disk provided by Stamper. Drumm had personal knowledge of JTP's acquisition of the Muguet software from Puga and MGE's Data Disk from Stamper. These materials were subject to the Order and impoundment, but were not surrendered. Thus, the testimony of JTP's witnesses that this Court's July 16, 2004 order was limited to the materials provided by White is wholly undermined by the clear language of the Court's Order. Moreover, at the earlier hearing, the declaration of Dr. Pooch identified the contents of the White CD as including MGE software as well as documents from MGE's Data Disk: "User's Guide EXLI000 Muguet Softtuner.tif" and "User's Guide Soft Tunor CS Addendum C7.tif" (Docket Entry No. 40, Exhibit 9 thereto).

Second, after the July 20th injunction JTP continued to retain and use MGE's software. It is undisputed that Cason kept a copy of this software for the purpose of using the software in JTP's business. "Cason told me that we would continue to use the [MGE] software internally and <u>keep a copy internally so we could configure units before they went out to the field</u> . . . <u>and to customers who purchased them.</u>"[7] (Vol. I, Transcript of the June 5, 2006 hearing on June 5, 2006 at pp. 22-23).

_____

[7]Cason did not appear at the hearing to contradict this testimony. Cason was on a fishing trip in Canada.

24

(emphasis added). "[I]nput of a work into a computer results in a making of a copy, and hence ... such unauthorized input infringes the copyright owner's reproduction right". 2 Melville B. Nimmer and David Nimmer on Copyright, § 8.08 [A] [1]    In addition, to Cason's retention of MGE's software, JTP only disabled the icon on JTP's computers, not the MGE software just remains on JTP computers.

Third, the MGE software remains on JTP's computers and  JTP personnel continued to utilize the MGE software and Data Disk after the injunction. The testimony of Sorgenfrei, Puga, Robey and Evans and the 162 JTP field  reports establish that JTP field representatives used one or more of MGE's software to test for the "Operational Verification" section in JTP's service report.

Fourth, the Court finds that JTP failed to impound "any" Data Disks in JTP's possession, as regained by this Court's July 16, 2004 order.  JTP continued to use MGE's Data Disk from July 16, 2004 injunction order, until March 22, 2004.  Drumm concedes that JT Packard still has MGE's Data Disk, but has it sequestered.  MGE's Data Disk includes the software guide for the "Comet (Ingrid) Software.  (Plaintiff's Exhibit 3).  (Volume III, Transcript of June 6, 2006 hearing p. 246). Confidential documents such as Plaintiff's Exhibit No. 3 that is covered by the July 20th Order, were available for all JTP field service engineers during this time and were used by JTP until at least March 24, 2006.

In sum, the Court finds that JTP has committed these separate and on-going violations of this Court's July 16, 2004 Injunction Order for which sanctions are necessary and appropriate.

Upon a finding of civil contempt the Court can issue sanctions, including for the entry of violations of a preliminary injunction order.  Redken Laboratories, 843 F.2d at 229-30.   The court, can impose "a remedial fine, which compensates the party who won the injunction for the effects of

25

his opponent's noncompliance." Hutto v. Finney, 437 U.S. 678, 691 (1978). The Court must "balance intrusiveness and effectiveness of the possible sanction." John B. v. Menke. 176 F. Supp.2d 786, 807 (M.D. Tenn. 2001). The determination of the appropriate sanction involves a common sense consideration of competing concerns: avoidance of punitive sanctions and selection of a sanction to "coerce the contemnor to comply". United States v. Tennessee, 925 F.Supp. at 1303.

Among the other available sanctions, the Court has the authority to strike pleadings and enter default judgment, but "[t]his power its limited. . . by the requirements of due process." Phoceene Sous-Marine v. U.S. Phosmarine, Inc., 682 F.2d 802, 806 (9th Cir. 1982). Under due process principles "a party should not be deprived of his opportunity to defend based on factors unrelated to the merits of his case." Id. (citing Hovey v. Elliot, 167 U.S. 409, 413-14 (1897)). A court may strike pleadings and enter default as a sanction for violating a court order, but should do so only where "one may reasonably infer from the suppression of relevant evidence that the defendant's case is lacking in merit." Id. (citing Hammond Packing Co. v. Arkansas, 212 U.S. 322, 351(1909). In a word, "[d]ue process concerns require that there exist a relationship between the sanctioned party's conduct and the matters in controversy such that the transgression threatens to interfere with a rightful decision of the case." Anheuser-Busch, Inc. v. Natural Beverage Distributors, 69 F.3d 337, 347 (9th Cir. 1995).

As stated earlier, the primary two purposes here are to ensure compliance with the Court's Order and to compensate the injured party. For the purpose of compensation, the proof reflects that JTP and Cason sought out, obtained and used JTP's software and Data Disk without MGE's authorization to enhance their profits. Cason, JTP's chief executive officer, issued a "directive" for the acquisition of MGE's materials that Cason deemed a "mission" of JTP. About one-third of JTP's

revenue is derived from JTP's servicing of MGE's UPS equipment. To serve the purpose of compensation, the Court imposes a monetary sanction of thirty (30%) of JTP's gross revenues from July 21, 2004 to date. This monetary sanction should compel compliance with the July 20th injunction and is reasonably tied to the Defendants' motivation for their noncompliance with the Court's Order.

To serve the purpose of ensuring compliance with the Court's July 16th Order, within the next thirty (30) days after entry of the companion Order, the Court will require JTP to produce all of its computers for inspection by MGE'S computer expert to ensure that all MGE software and trade secrets are removed from JTP's computers and harddrives. JTP shall pay the costs of MGE's expert's work under this Order.

The costs of prosecuting a civil contempt motion, including reasonable attorneys' fees, may be awarded, where the contemnor: (1) had actual notice of the order; (2) was able to comply with it; (3) did not seek to have it modified; and (4) did not make a good faith effort to comply. See Chere Amie, Inc. v. Windstar Apparel Corp., 175 F.Supp.2d 562, 567 (S.D.N.Y. 2001). Based upon the factual findings set forth above, the Court finds that each of these elements is established by the proof.

The Court awards MGE its reasonable fees and expenses in pursuing this motion MGE shall provide documentation concerning those fees and costs in accordance with Local Rule 54.01.

27

An appropriate Order is filed herewith.

**ENTERED** this the ___5th___ day of December, 2006.

WILLIAM J. HAYNES, JR.
United States District Judge

Case 3:04-cv-00231   Document 701   Filed 12/06/06   Page 28 of 28 PageID #: 9080